786 S.E.2d 219

**STATE of West Virginia, Respondent**

v.

**Stephanie Elaine LOUK, Petitioner**

No. 15-0021

Supreme Court of Appeals of West Virginia.

Submitted: April 19, 2016

Filed: May 27, 2016

Concurring Opinion of Justice Davis June 3, 2016

Jason D. Parmer, Esq., Public Defender Services, Charleston, West Virginia, Counsel for the Petitioner

Diana Panucci, Esq., 13th Judicial Circuit, Public Defender Corp., Charleston, West Virginia, Farah Diaz-Tello, Esq., National Advocates for Pregnant Women, New York, New York, Counsel for Amici Curiae

Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Julie A. Warren, Assistant Attorney General, Charleston, West Virginia, Counsel for the Respondent

Chief Justice Ketchum:

Petitioner Stephanie Louk ("Ms. Louk") was convicted of child neglect resulting in death in violation of W.Va. Code § 61-8D-4a [1997], and sentenced to three to fifteen years of incarceration by the Circuit Court of Nicholas County. Ms. Louk appeals the circuit court's December 9, 2014, sentencing order. She argues that when the Legislature wrote our child neglect resulting in death statute, it did not include prenatal acts that result in harm to a subsequently born child.

We have read the law and it is clear: when enacting our child neglect resulting in death statute, the Legislature did not criminalize a mother's prenatal act that results in harm to her subsequently born child. We therefore reverse the circuit court's December 9, 2014, sentencing order. Although we recognize that there may be significant policy implications and social ramifications surrounding the present issue, our review is confined to the plain language of the statute enacted by the Legislature. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. This Court does not sit as a superlegislature, commissioned to pass upon the social, political, or

scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions. Thus, the Court's duty in this matter is to enforce the plain language of the child neglect resulting in death statute enacted by the Legislature.[1]

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 11, 2013, Ms. Louk injected methamphetamine into her left arm. She was thirty-seven weeks pregnant at that time. A few hours after injecting the methamphetamine, Ms. Louk experienced breathing problems and went to Summersville Regional Hospital. Dr. Tracey Lester treated Ms. Louk upon her arrival at the hospital. Dr. Lester testified that Ms. Louk presented to the emergency room with acute respiratory distress which was caused by her methamphetamine use. Dr. Lester described acute respiratory distress and its effect on Ms. Louk and her fetus [2] as follows:

It can cause you to get fluid in your lungs.... In that situation, your lungs fill up with fluid, and your blood stream is not able to get oxygen from your lungs and take it to your brain and vital organs to provide your body, you know, fuel to survive....

When you are deprived oxygen, whether you are pregnant or not, your body shunts all available blood to the brain and the heart for survival....

And with a pregnant patient, blood is going to be shunted away from the baby, away from the placenta to try to keep the mother alive. Any available oxygen is go-

---

**1.** We acknowledge the contribution of amici curiae brief filed by counsel Diana Panucci and Farah Diaz-Tello on behalf of the following parties: West Virginia State Medical Association; West Virginia Perinatal Partnership; West Virginia Society of Addiction Medicine; West Virginia Lawyer Assistance Program; American College of Obstetricians and Gynecologists; American Society of Addiction Medicine; Association of Reproductive Health Professionals; C.A.R.E. Alliance NW, Inc.; Drug Policy Alliance; Drug Policy Forum of Hawai'i; Harm Reduction Coalition; Institute for Health and Recovery; International Centre for Science in Drug Policy; Legal Action Center; Medication Assisted Recovery Services; National Alliance of Medication Assisted Recovery; National Alliance for Medication Assisted Recovery of Tennessee; National Perinatal Association; National Women's Health Network; North American Society for Psychological Obstetrics and Gynecology; National Council on Alcoholism and Drug Dependence, Inc.; National Latina Institute for Reproductive Health; Project R.E.S.P.E.C.T.; Student Assistance Services; Ronald Abrahams, MD; Annette Ruth Appell, JD; Elizabeth M. Armstrong, PhD, MPA; Sheila Blume, MD; Adam J. Breinig, DO, FAAFP; Norma Finkelstein, PhD, LICSW; Nikki Easterling, M.Ed., CDP, CC; Fonda Davis Eyler, PhD; Julia B. Frank, MD; P. Bradley Hall, MD, DABAM, FASAM; Wanda M. Hembree, MD; T. Stephen Jones, MD, MPH; Karol Kaltenbach, PhD; Mary Faith Marshall, PhD, FCCM; Anna Mastroianni, JD, MPH; John J. McCarthy, MD, APBN, ABAM; Howard Minkoff, MD; Ellen Morehouse; Daniel R. Neuspiel, MD, MPH; Robert G. Newman, MD, MPH; Ronni Rittenhouse, PhD; Kelley Saia, MD; Sharon Stancliff, MD, FAAFP; Zachary Talbott, MS, CMA; Bruce Trigg, MD; Michael Vernon, PhD, HCLD, ELD; Linda L.M. Worley, MD; Tricia E. Wright, MD, MS, FACOG, Diplomate ABAM; Jessica Young, MD, MPH; and Sherri Young, DO, FAAFP.

The amici urge this Court to reverse Ms. Louk's conviction and rule that the plain language of our child neglect resulting in death statute enacted by the Legislature does not encompass a prenatal act that results in harm to a subsequently born child. We value their contributions to this case and have considered their brief in conjunction with the parties' arguments.

**2.** The terms "fetus" and "unborn child" are often used interchangeably. Justice Cleckley discussed the use of these two terms in *Farley v. Sartin*, 195 W.Va. 671, n. 3, 466 S.E.2d 522, n. 3 (1995), stating:

At this gestational age of development, an unborn child often is referred to as a fetus. Biologically, a fetus is defined as "the unborn offspring in the post embryonic period after major structures have been outlined (in man from seven or eight weeks after fertilization until birth)." *Black's Law Dictionary* 621 (6th ed. 1990)....

Throughout the cases and literature reviewed and cited by this Court, the terms "fetus" and "unborn child" frequently are used interchangeably.... By our use of the phrase "unborn child" in the context of this opinion, we are sensitive to those who may have philosophical, religious, or other reasons why they prefer the term "fetus" over the phrase "unborn child" or vice versa. In this respect, our reference is not designed to pass judgment upon these reasons nor do we intend to invoke an emotional response on the part of the reader.

ing to be going to the brain and the heart of the mother to try to sustain life....

The baby would normally be getting plenty of oxygen from the mother, but, in this situation where the mother isn't getting enough oxygen to survive herself, any available oxygen's going to the mother, and it's going to be shunted away from the baby to the mother for her survival.

Due to concerns about Ms. Louk's fetus being deprived of oxygen, Dr. Lukasz Rostocki performed an emergency Cesarean section and delivered the child. The child, Olivia Louk, was born "essentially brain dead," according to Dr. Susan Venuti, the forensic pathologist who performed Olivia Louk's autopsy. Dr. Venuti testified that upon being born, Olivia Louk "had no movement, no spontaneous respirations, and they had to immediately put her on a ventilator to help her breathe." Olivia Louk died eleven days after she was born. Her death certificate states:

> **Cause of Death and Contributory Conditions/Factors:** It is our opinion that Olivia Louk, an 11 day old female infant who resided in the hospital since birth, died as the result of anoxic encephalopathy following the emergent delivery by Cesarean section to a mother with cardiorespiratory insufficiency in the setting of methamphetamine, benzodiazepine and opioid intoxication. The mother was diagnosed with a new onset cardiomyopathy, clinically diagnosed as possibly stress-induced or drug-induced, and less likely a peripartum cardiomyopathy....
>
> This infant's death occurred in the setting of maternal drug abuse; however, other natural causes contributing to the mother's cardiorespiratory insufficiency cannot be excluded by the postmortem examination of this newborn.

(Boldface in original.)

On January 14, 2014, Ms. Louk was indicted by a Nicholas County Grand Jury on one felony count of child neglect resulting in death in violation of W.Va. Code § 61-8D-4a. The indictment charged Ms. Louk with ingesting methamphetamine which resulted in the death of her child.

Ms. Louk filed a motion to dismiss the indictment, arguing that the law "regarding whether the state can prosecute a pregnant woman for a neonatal loss allegedly caused by a drug overdose during pregnancy is abundantly clear: the legislature has refused to make women criminally liable for the outcome of their pregnancies." The circuit court denied the motion to dismiss. During a pretrial hearing on Ms. Louk's motion to dismiss, the circuit court explained its ruling as follows: "I'm going to deny the motion to dismiss. I think the child was alive—born alive, and it died eleven days later, and, I mean—and when we get down to doing instructions in this case, I'll have to be a little more specific about what—what comes within that statute, but we will—we'll cross that bridge when we get to it."

Following a two day jury trial, Ms. Louk was convicted of one felony count of child neglect resulting in death. The circuit court subsequently ordered that she be incarcerated for three to fifteen years. Ms. Louk appeals the circuit court's sentencing order.

## II.

### STANDARD OF REVIEW

This Court's standard of review is set forth in Syllabus Point 1 of *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). It states, "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."

## III.

### ANALYSIS

■ The issue before this Court is whether a pregnant woman who ingests a controlled substance which results in harm to her subsequently born child can be charged with child neglect resulting in death, as set forth in W.Va. Code § 61-8D-4a. The offense of child neglect resulting in death under W.Va. Code § 61-8D-4a provides:

> If any parent, guardian or custodian *shall neglect a child* under his or her care, custody or control and by such neglect

cause the death of said child, then such parent, guardian or custodian shall be guilty of a felony and, upon conviction thereof, shall be fined not less than one thousand dollars nor more than five thousand dollars or committed to the custody of the division of corrections for not less than three nor more than fifteen years, or both such fine and imprisonment.

(Emphasis added.) The term "child" is defined in W.Va. Code § 61-8D-1(2): "'Child' means any person under eighteen years of age not otherwise emancipated by law."

Ms. Louk argues that an individual cannot be charged with child neglect resulting in death under W.Va. Code § 61-8D-4a for prenatal ingestion of a controlled substance because an "unborn child" or "fetus" is not a "child" under the statute. By contrast, the State contends that "a child injured prior to birth but born alive, is a 'child' as defined in W.Va. Code § 61-8D-1(2), and may be a victim of parental neglect pursuant to W.Va. Code § 61-8D-4." Further, the State argues that Ms. Louk's criminal liability for Olivia Louk's death "is consistent with the common law 'born alive' rule."

■ This issue requires us to examine W.Va. Code § 61-8D-4a. We therefore begin with a review of our rules of statutory construction. This Court has held that in deciding the meaning of a statutory provision, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995); *see also* Syllabus Point 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); and Syllabus Point 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

Additionally, this Court has held that "[a] statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Sizemore v. State Farm Gen. Ins. Co.*, 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) (internal quotations and citation omitted). With these rules of statutory construction in mind, we turn to W.Va. Code § 61-8D-4a.

■ The present dispute centers around the parties' conflicting interpretations of the word "child" contained in W.Va. Code § 61-8D-4a. As this Court recognized in *West Virginia Health Care Cost Review Authority v. Boone Memorial Hosp.*, 196 W.Va. 326, 472 S.E.2d 411 (1996), "[i]t is a fundamental principle of statutory construction that the meaning of a word cannot be determined in isolation, but it must be drawn from the context in which it is used." *Id.* at 338, 472 S.E.2d at 423.

Upon our review of W.Va. Code § 61-8D-4a, we determine that the statute is not ambiguous. The plain language of W.Va. Code § 61-8D-1(2) states that a child is "any person under eighteen years of age[.]" This statutory definition does not include either an "unborn child" or a "fetus" within the meaning of "child." Similarly, W.Va. Code § 61-8D-4a does not include either an "unborn child" or a "fetus," rather, *it only refers to a parent neglecting "a child"* under his or her care, custody or control.

While 61-8D-4a does not mention prenatal conduct or make any reference to an "unborn child" or a "fetus," a number of other West Virginia statutes specifically address unborn children. Multiple courts outside of our jurisdiction, confronted with this issue, have found that because the Legislature specifically provides for the protection of an unborn child, this "demonstrates the ease and clarity with which the legislature may, if it so chooses, apply a statute to the unborn." *State v. Deborah J.Z.*, 228 Wis.2d 468, 477, 596 N.W.2d 490, 494 (1999). *See also State v. Dunn*, 82 Wash.App. 122, 128, 916 P.2d 952, 955 (1996) ("When the Legislature intends to include the fetus in a class of criminal vic-

tims, it specifically writes that language into the statute."). Like these other jurisdictions, we conclude that when our Legislature intends to include an unborn child in a statute, it writes that language into the statute. Our Legislature has addressed unborn children in a variety of other statutes, and has done so with absolute clarity.

For instance, in 2005, the Legislature passed the Unborn Victims of Violence Act, W.Va. Code § 61-2-30 [2005]. The Unborn Victims of Violence Act defines a "fetus" as "a developing human that has ended the embryonic period and thereafter continues to develop and mature until termination of the pregnancy or birth." W.Va. Code § 61-2-30(b)(2). The Unborn Victims of Violence Act specifically provides that a "fetus" can be the victim of certain violent crimes including murder, voluntary manslaughter, attempt to kill or injure by poison, stalking, wanton endangerment by use of fire, assault during the commission of a felony, malicious and unlawful assault, and domestic battery. W.Va. Code § 61-2-30(c). The Unborn Victims of Violence Act does not provide for the prosecution of a pregnant mother based on prenatal conduct resulting in harm to the subsequently born child. In fact, the statute exempts pregnant women from criminal liability for the offenses set forth in W.Va. Code § 61-2-30(c), stating "[t]he provisions of this section do not apply to: ... Acts or omissions of a pregnant woman with respect to the embryo or fetus she is carrying." W.Va. Code § 61-2-30(d)(5).

In addition to the Unborn Victims of Violence Act, the Legislature specifically addressed "unborn children" and defined the term "fetus" in W.Va. Code § 16-2M-1, et seq. [2015]. This statute makes a number of express references to an "unborn child." See W.Va. Code §§ 16-2M-3(3), (5), (10). Further, the term "fetus" is defined in W.Va. Code 16-2M-2(4) as "the developing young in the uterus, specifically the unborn offspring in the postembryonic period from nine weeks after fertilization until birth."

Unborn children are also expressly addressed in the West Virginia Uniform Trust Code, W.Va. Code § 44D-1-101, et seq. [2011]. This statute specifically protects the rights of an "unborn individual" who has an interest in a matter arising under the Uniform Trust Code. W.Va. Code § 44D-3-305(a) provides:

> If the court determines in a judicial proceeding that an interest is not represented under this chapter, or that the otherwise available representation might be inadequate, the court may appoint a representative to receive notice, give consent, and otherwise represent, bind, and act on behalf of a minor, incapacitated or **unborn individual**, or a person whose identity or location is unknown. A representative may be appointed to represent several persons or interests.

(Emphasis added.) Similarly, the Uniform Trust Code states "[a] parent may represent and bind the parent's *minor or unborn child* if a conservator or guardian for the child has not been appointed[.]" W.Va. Code § 44D-3-303(5) (emphasis added). Finally, the Uniform Trust Code provides that "[i]f *a minor or unborn person* is not otherwise represented under this section, a grandparent or more remote ancestor may represent and bind that *minor or unborn person.*" W.Va. Code § 44D-3-303(6) (emphasis added).

The Legislature has defined the term "minor" in the same manner in which it defined "child." " 'Minor' means an individual who is under eighteen years of age." W.Va. Code § 16-19-3(18). The fact that the Legislature included both "minor" and "unborn child" in W.Va. Code § 44D-3-303(5) demonstrates that these two terms are not synonymous and have distinct meanings.[3] The terms "minor" and "child" have been defined as a person or individual who is under the age of

---

**3.** In Syllabus Point 7 of *Ex parte Watson*, 82 W.Va. 201, 95 S.E. 648 (1918), this Court held:

> It is presumed that the legislature had a purpose in the use of every word, phrase and clause found in a statute and intended the terms so used to be effective, wherefore an interpretation of a statute which gives a word,

phrase or clause thereof no function to perform, or makes it, in effect, a mere repetition of another word, phrase or clause thereof must be rejected as being unsound, if it be possible so to construe the statute as a whole, as to make all of its parts operative and effective.

eighteen. By contrast, a "fetus" is "a developing human that has ended the embryonic period and thereafter continues to develop and mature until termination of the pregnancy or birth." W.Va. Code § 61-2-30(b)(2).

■ It is clear from the foregoing statutes that when the Legislature intends to include an "unborn child," "fetus," "unborn individual," or "unborn person" within a statute, it does so with absolute clarity. The Legislature did not include "unborn child," "fetus," "unborn individual," or "unborn person" in the child neglect causing death statute, W.Va. Code § 61-8D-4a. Nor did it include any of these terms in the definition of "child" contained in W.Va. Code 61-8D-1(2). "It is not for this Court arbitrarily to read into a statute that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." Syllabus Point 11, *Brooke B. v. Ray*, 230 W.Va. 355, 738 S.E.2d 21 (2013).

Next, we agree with Ms. Louk that, were we to interpret W.Va. Code § 61-8D-4a to reach the prenatal conduct on which her prosecution was based, we would offend due process notions of fundamental fairness and render the statute impermissibly vague. This Court has addressed the purported vagueness of a criminal statute, holding that " '[a] criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication.' Syllabus Point 1, *State v. Flinn*, 158 W.Va. 111, 208 S.E.2d 538 (1974)." Syllabus Point 1, *State v. Bull*, 204 W.Va. 255, 512 S.E.2d 177 (1998). Because the statutory reference to "child" in W.Va. Code § 61-8D-4a does not include any mention of an "unborn child" or a "fetus," Ms. Louk could not reasonably have known she could be prosecuted for child neglect based on her prenatal conduct. *See Georgia v. Luster*, 204 Ga.App. 156, 419 S.E.2d 32, 34 (1992) (pregnant woman could not have known use of illegal drugs that affected the fetus could subject her to criminal prosecution). The conduct prohibited by W.Va. Code § 61-8D-4a is neglect resulting in the death of a child. Were we to extend the statute to prenatal conduct that affects a fetus in a manner apparent after birth—conduct that would be defined solely in terms of its impact on the victim—the boundaries of proscribed conduct that would subject a pregnant woman to prosecution under W.Va. Code § 61-8D-4a would become impermissibly broad and ill-defined.

"Many types of prenatal conduct can harm a fetus, causing physical or mental abnormalities in a newborn. For example, medical researchers have stated that smoking during pregnancy may cause, among other problems, low birth weight, which is a major factor in infant mortality." *Reinesto v. Superior Ct. of Ariz.*, 182 Ariz. 190, 193, 894 P.2d 733, 736 (Ct.App.1995). The court in *Reinesto* found that numerous prenatal activities could harm a fetus: (1) drinking alcoholic beverages during pregnancy can lead to fetal alcohol syndrome, a condition characterized by mental retardation, prenatal and postnatal growth deficiencies, and facial anomalies; (2) a pregnant woman's failure to obtain prenatal care or proper nutrition also can affect the status of the newborn child; (3) poor nutrition can cause a variety of birth defects: insufficient prenatal intake of vitamin A can cause eye abnormalities and impaired vision; insufficient doses of vitamin C or riboflavin can cause premature births; (4) poor prenatal care can lead to insufficient or excessive weight gain, which also affects the fetus; and (5) some research has suggested that consuming caffeine during pregnancy contributes to low birth weight. *Id.*

One court outside of our jurisdiction, confronted with this issue, similarly observed that

if, as the State urges, the statute is read to apply to the effect of a pregnant woman's conduct on the child she is carrying, it could well be construed to include not just the ingestion of unlawful controlled substances but a whole host of intentional and conceivably reckless activity that could not possibly have been within the contemplation of the Legislature—everything from ... the continued use of legal drugs that are contraindicated during pregnancy, to consuming alcoholic beverages to excess,

to smoking, to not maintaining a proper and sufficient diet, to avoiding proper and available prenatal medical care, to failing to wear a seat belt while driving, to violating other traffic laws in ways that create a substantial risk of producing or exacerbating personal injury to her child, to exercising too much or too little, indeed to engaging in virtually any injury-prone activity that, should an injury occur, might reasonably be expected to endanger the life or safety of the child. Such ordinary things as skiing or horseback riding could produce criminal liability. If the State's position were to prevail, there would seem to be no clear basis for categorically excluding any of those activities from the ambit of the statute; criminal liability would depend almost entirely on how aggressive, inventive, and persuasive any particular prosecutor might be.

*Kilmon v. State*, 394 Md. 168, 177–78, 905 A.2d 306, 311–12 (Ct.App.2006).

Additionally, the State's suggested construction of W.Va. Code § 61-8D-4a would lead to criminalizing conduct—the prenatal ingestion of drugs—when it results in the birth of a live child, while not criminalizing the same conduct if the unborn child dies in utero. This problem was addressed by the Supreme Court of North Dakota, which ruled that a pregnant woman is not criminally liable for the endangerment of a child for prenatal conduct that harms a subsequently born child. The court stated that to rule otherwise "would create an absurd result. It would criminalize conduct that is not a crime at the time the conduct occurs, is not a crime if the unborn child dies in utero, but is a crime only by virtue of its effect on the child born alive." *State v. Stegall*, 828 N.W.2d 526, 533 (N.D. 2013).

Nevertheless, the State argues that W.Va. Code § 61-8D-4a must be interpreted alongside the common law "born alive" rule. According to the State, this Court previously adopted the "born alive" rule and argues that under this rule, it is "irrelevant that the harm was inflicted upon [Olivia Louk] a day

before she was born." [4] The State argues that "the Court must find that a child injured prior to birth but born alive is a 'child' as defined in W.Va. Code § 61-8D-1(2), and may be a victim of parental neglect" pursuant to W.Va. Code § 61-8D-4. We disagree.

This Court discussed the common law "born alive" rule in *State ex rel. Atkinson v. Wilson*, 175 W.Va. 352, 332 S.E.2d 807 (1984). In *Atkinson*, the Court acknowledged that "a tort action for wrongful death could be brought on behalf of a viable unborn child." *Id.* at 353, 332 S.E.2d at 808. The Court in *Atkinson* refused to expand the "born alive" rule to cover criminal offenses, holding, "Neither our murder statute, W.Va. Code, 61-2-1, nor its attendant common law principles authorize prosecution of an individual for the killing of a viable unborn child." *Id.*, Syllabus Point 2. Since *Atkinson* was decided, the Legislature passed the Unborn Victims of Violence Act, which provides that a "fetus" can be the victim of certain violent crimes. W.Va. Code § 61-2-30(c). However, the Unborn Victims of Violence Act did not expand the "born alive" rule to cover child neglect resulting in death. In fact, *the Unborn Victims of Violence Act specifically exempted pregnant women from prosecution under the Act.* We therefore decline to adopt the State's argument and expand the "born alive" rule to cover the present situation—a pregnant woman's ingestion of an illegal controlled substance that results in harm to the subsequently born child. In so ruling, we note that "[t]he legislature has the primary right to define crimes and their punishments subject only to certain constitutional limitations." *Atkinson*, Syllabus Point 1.

Finally, we note that the overwhelming majority of the jurisdictions confronted with the prosecution of a mother for prenatal conduct causing harm to the subsequently born child, refuse to permit such prosecutions. *See Arms v. State*, 2015 Ark. 364, 471 S.W.3d 637 (2015) (Defendant's unborn child was not a "person," for purposes of statute governing criminal offense of introduction of a controlled substance into the body of anoth-

---

**4.** This Court recognized that a tort action for wrongful death could be brought on behalf of a viable unborn child in Syllabus Point 1 of *Bald-* win v. Butcher, 155 W.Va. 431, 184 S.E.2d 428 (1971).

er person, and thus none of defendant's actions prior to birth of child violated statute; criminal code expressly limited criminalizing conduct with respect to unborn child to homicide offenses and even then did not allow a mother to be charged or convicted of any homicide offense while her child was in utero); *State v. Stegall, supra* (pregnant woman cannot be charged for a crime allegedly committed against her unborn child; unborn fetus was not a "child" within meaning of endangerment statute); *State v. Martinez*, 139 N.M. 741, 137 P.3d 1195 (Ct.App.2006) (holding an unborn viable fetus is not a "human being" under the New Mexico child abuse statute and the mother's use of cocaine during pregnancy was not child abuse); *Kilmon v. State, supra* (holding a mother may not be held criminally liable under a reckless endangerment statute for the effect that prenatal ingestion of a controlled substance may have on her child, pre- or post-birth); *State v. Aiwohi*, 109 Hawai'i 115, 123 P.3d 1210 (2005) (holding, for purposes of establishing the offense of reckless manslaughter against a pregnant woman, a fetus is not a person); *State v. Deborah J.Z., supra* (holding that defendant mother's fetus was not a human being for the purposes of the attempted first degree intentional homicide and first degree reckless injury statutes); *State v. Ashley*, 701 So.2d 338, 342 (Fla.1997) (stating that to allow the manslaughter prosecution of a mother for prenatal conduct "would require that this Court extend the 'born alive' doctrine in a manner that has been rejected by every other court to consider it"); *State v. Dunn*, 82 Wash.App. 122, 916 P.2d 952 (1996) (holding an unborn child is not a child for purposes of criminal prosecution of mistreatment of a child); *Reinesto v. Superior Ct. of Ariz., supra* (holding a mother was not criminally liable for knowingly causing injury to a child under circumstances likely to produce death or serious physical injury after the mother's pre-birth ingestion of heroin caused her child to suffer heroin withdrawal symptoms postpartum); *Collins v. State*, 890 S.W.2d 893 (Tex.Ct.App.1994) (holding a fetus is not a child, person, or individual for purposes of criminal prosecution under the reckless injury to a child statute); *Sheriff, Washoe Cnty. v. Encoe*, 110 Nev. 1317, 885 P.2d 596 (1994) (holding a criminal charge of endangerment of a child does not apply to a pregnant woman who ingests an illegal substance that results in the transmission of drugs to her child through the umbilical cord); *Commonwealth v. Welch*, 864 S.W.2d 280 (Ky.1993) (holding a mother's ingestion of a controlled substance while pregnant does not constitute child abuse, as an unborn child is not a person for purposes of criminal prosecution); *State v. Gray*, 62 Ohio St.3d 514, 584 N.E.2d 710 (1992) (holding Ohio's child endangerment statute does not apply to mothers who abuse drugs during pregnancy); *People v. Morabito*, 151 Misc.2d 259, 580 N.Y.S.2d 843, 847 (N.Y.City.Ct.1992) (holding that the defendant mother could not be charged with endangering the welfare of a child based upon prenatal acts endangering an unborn child); *State v. Gethers*, 585 So.2d 1140 (Fla.Ct.App.1991) (holding child abuse statute clearly did not apply to fetuses and, therefore, did not apply to a mother who ingested cocaine during pregnancy); *People v. Hardy*, 188 Mich.App. 305, 469 N.W.2d 50 (1991) (holding a pregnant woman who uses cocaine is not criminally liable for delivery of a controlled substance, despite the possibility the drug may transfer to her infant postpartum via the umbilical cord); *Reyes v. Superior Ct. of San Bernardino Cnty.*, 75 Cal. App.3d 214, 141 Cal.Rptr. 912 (1977) (holding a mother not criminally liable for child endangerment for ingesting heroin while pregnant).[5]

---

**5.** Contrary to the majority of states, South Carolina and Alabama have held an unborn child is a child, person, or individual for purposes of criminal prosecution. *See Ankrom v. State*, 152 So.3d 373 (Ala.Crim.App.2011) (holding an unborn child is a child for purposes of prosecuting chemical endangerment of a child); *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (S.C.1997), *cert. denied*, 523 U.S. 1145, 118 S.Ct. 1857, 140 L.Ed.2d 1104 (1998) (holding a woman may be prosecuted for child neglect and endangering a child for prenatal substance abuse). South Carolina Supreme Court Justice James E. Moore filed a dissenting opinion in *Whitner* in which he criticized the majority opinion for engaging in judicial activism and argued that the legislative branch was the proper place for this issue to be resolved. Justice Moore stated:

In my view, the repeated failure of the legislature to pass proposed bills addressing the problem of drug use during pregnancy is evi-

In conformance with the overwhelming majority view, and the plain language of our statute, we hold that the Legislature did not make any reference to an "unborn child" or "fetus" in W.Va. Code § 61-8D-4a. The statute only refers to a parent neglecting "a child" under his or her care, custody or control. Therefore, W.Va. Code § 61-8D-4a, our child neglect resulting in death statute, does not encompass prenatal acts that result in harm to a subsequently born child. Thus, a pregnant woman who ingests a controlled substance that results in harm to her subsequently born child is not criminally liable for child neglect resulting in death based on the plain language of W.Va. Code § 61-8D-4a.

While we conclude that W.Va. Code § 61-8D-4a does not apply to prenatal conduct that results in harm to a subsequently born child, we are troubled by the present case and wish to emphasize our great concern with the issue raised herein. The Supreme Court of Arkansas recently addressed this issue, stating: "No one wishes to discourage pregnant women who are fighting an addiction from seeking treatment and rehabilitation for substance abuse. The argument has been made that criminal prosecutions will have that effect. However, that balancing of legitimate policies is to be made by the legislature, and not by this court." *Arms v. State*, 2015 Ark. at 377, 471 S.W.3d at 645 (Brill, Howard W., Chief Justice, concurring). According to the brief filed by the amici curiae, the *American Medical Association* "opposes legislation which criminalizes maternal drug addiction." The AMA has warned against the deterrent effect of threats of such punishment because:

> Pregnant women will be likely to avoid seeking prenatal or open medical care for fear that their physician's knowledge of substance abuse or other potentially harmful behavior could result in a jail sentence rather than proper medical treatment.

dence the child abuse and neglect statute is not intended to apply in this instance. This Court should not invade what is clearly the sole province of the legislative branch. At the very least, the legislature's failed attempts to enact a statute regulating a pregnant woman's conduct indicate the complexity of this issue. . . . [I]t is for the General Assembly, and not this Court,

Am. Med. Ass'n Bd. of Trustees, *Legal Interventions During Pregnancy*, 264 J. Am. Med. Ass'n 2663, 2667 (1990).

■ "A court should not place a tenuous construction on [a] statute to address a problem to which the legislative attention is readily directed and which it can readily resolve if in its judgment it is an appropriate subject of legislation. . . . [I]f a legally cognizable duty on the part of pregnant women to their developing fetuses is to be recognized, the decision must come from the legislature only after thorough investigation, study and debate." *State v. Gray*, 62 Ohio St.3d at 518, 584 N.E.2d at 713 (internal citation omitted).

## IV.

## CONCLUSION

For the reasons set forth herein, we vacate Ms. Louk's conviction and sentence, and remand this matter to the circuit court for entry of a judgment of acquittal on the indictment returned against her in this action.

Vacated and Remanded for Judgment of Acquittal.

JUSTICE BENJAMIN concurs and reserves the right to file a concurring Opinion.

JUSTICE DAVIS concurs and reserves the right to file a concurring Opinion.

JUSTICE LOUGHRY dissents and reserves the right to file a dissenting Opinion.

JUSTICE WORKMAN dissents and reserves the right to file a dissenting Opinion.

BENJAMIN, J., concurring: ·

Words are inadequate for the tragedy occasioned by Ms. Louk's injection of methamphetamine into her body in her thirty-

to make that determination by means of a clearly drawn statute. With today's decision, the majority not only ignores legislative intent but embarks on a course of judicial activism rejected by every other court to address the issue.

*Id.*, 328 S.C. at 21, 492 S.E.2d at 787.

seventh week of pregnancy. Because of her actions, an innocent child is dead. While I have dedicated much of my service in the judiciary to helping individuals take responsibility for their decisions, overcome their addictions and turn their lives around, I cannot personally excuse the decision taken here by Ms. Louk—a decision which not only harmed herself, but which also resulted in the senseless end of the life of another. However addiction may explain irresponsible behavior, it does not excuse it. What Ms. Louk did was wrong. If I were to step away from my duty to follow the law, and to instead make it, I might be tempted, as others, to affirm this conviction.

The law is inadequate to address this tragedy. However much I might believe that Ms. Louk was wrong, the decision of whether actions such as hers are criminal is that of the West Virginia Legislature. That is the essence of a government and a judicial system based upon the constitution, the rule of law, and the fundamental precept that the policy of this state is the prerogative of the political branches of government—not a handful of judges making decisions behind closed doors. Our Legislature has chosen not to criminalize behavior such as Ms. Louk's. No amount of wishful thinking or artful reading of our law permits another conclusion. The unambiguous laws at issue, West Virginia Code § 61-8D-4a (1997) and West Virginia Code § 61-8D-1 (2005),[1] are as plain as they are specific—they do not provide for the criminal prosecution undertaken herein of Stephanie Louk under these facts. And while, out of a desire to assuage a personal sense of outrage, it may be tempting for a judge to here engage in activism under the guise of supposed statutory interpretation, it is beyond this court's legal and constitutional province to make criminal that which the legislature has not.

Pursuant to West Virginia Code § 61-8D-4a, a parent is guilty of a felony if that parent "neglect[s] a child under his or her care, custody or control and by such neglect causes the death of said child." As used in this section, " '[c]hild' means any person under eighteen years of age not otherwise emancipated by law." W. Va. Code § 61-8D-1. As reflected in the majority opinion, West Virginia Code § 61-8D-1 unambiguously refers to a child in being, not the unborn. Had the Legislature intended "child" to include the unborn, it would have expressly said so, which it has done elsewhere in the Code.

Contorting West Virginia Code § 61-8D-1 to include the unborn within the definition of a "child" creates irreconcilable conflicts between the provisions of article 8D, chapter 61 and other provisions in the Code. For example, under West Virginia Code § 61-8D-2a, it is a crime for a parent to knowingly allow another person to inflict upon their child any impairment of physical condition that results in death to the child. If "child" includes the unborn, West Virginia Code § 61-8D-2a would criminalize behavior explicitly excluded as criminal behavior elsewhere in the Code. *See* W. Va. Code § 61-2-30(d)(1) (2005) (excluding the acts of a pregnant woman with respect to the embryo or fetus from giving rise to prosecution under the Unborn Victims of Violence Act); W. Va. Code § 16-2M-6 (2015) (providing that "[n]o penalty may be assessed against any patient upon whom an abortion is performed or induced"). It is illogical to assume that the same legislature which immunized a woman from prosecution for receiving an illegal abortion, such as a late term abortion, nevertheless intended to permit the prosecution of a woman for taking drugs during pregnancy that ultimately resulted in the death of her fetus or subsequently born child.

A similar absurdity arises when forcing the nearly identical definitions of "child" in other sections of the Code to include the unborn. For instance, in the article addressing grandparent visitation, West Virginia Code § 48-10-202 (2001) defines "child" as "a person under the age of eighteen years who has not been married or otherwise emancipated." This definition is almost a mirror image of the definition of "child" provided in West Virginia Code § 61-8D-1. If the Legislature

---

1. This statute was amended in 2014, but the changes did not affect the definition of "child" as it appeared in the 2005 version of the statute.

had intended that "child" include the unborn in West Virginia Code § 61-8D-1, then the substantively identical language in West Virginia Code § 48-10-202 must also include the unborn. It would necessarily follow, then, that grandparents could file a motion or petition for visitation with a fetus. *See* W. Va. Code § 48-10-301 ("A grandparent of a child residing in this State may, by motion or petition, make application to the circuit court or family court of the county in which that child resides for an order granting visitation with his or her grandchild."). Likewise, fetuses could be subject to custody determinations under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), W. Va. Code § 48-20-101 to -404. *See* W. Va. Code § 48-20-102 (2001) (defining "child" as "an individual who has not attained eighteen years of age"). Unmistakably, straining the grandparent visitation statutes and the UCCJEA to apply to the unborn defies common sense, just as it does in West Virginia Code § 61-8D-4a.

Though perhaps emotionally tempting, stretching West Virginia Code § 61-8D-4a to permit this criminal prosecution to stand, *i.e.*, the prosecution of a woman for acts committed during pregnancy that contribute to the death of a subsequently born child, renders the statute hopelessly vague. What conduct would constitute unlawful neglect? Would the failure to seek prenatal care constitute neglect if the subsequently born child dies? Could eating raw oysters during pregnancy, which is commonly known to carry a risk of food poisoning, be considered neglect? At what stage in the pregnancy would any such acts be neglectful? Would all the mothers of newborn children that die be the potential subject of investigations to determine if any of their activities while pregnant contributed to the death of their children?[2]

My personal outrage at Ms. Louk's actions is admittedly driven by frustration. No matter how much I may wish to simply judge under the law, I cannot ignore or forget the victim here. This child should today be playing, laughing and engaging in the things children do. This child was a victim. If there is a victim, one might expect that there should be a crime. But, no matter how much others may argue to the contrary, here the legislature has decided otherwise.

I recognize that the Legislature was faced with many considerations in making the public policy as it relates to the facts of this case. My personal concerns, which are based upon the facts of this case, are in no way meant to minimize or disregard such other considerations. Aside from the statutory conflict and vagueness that would result from the State's position, there are overriding health and safety concerns which the legislature could look to in justifying the immunization of pregnant women from prosecution for things they may do to themselves—such as ingesting harmful substances—that may harm fetuses they carry. Chief among these is the concern that pregnant women may not seek health care that might be of great benefit to them and their unborn children for fear of criminal prosecution.[3]

2. A study examining pregnant women between 2008 and 2011 revealed that more than 1 in four pregnant women in West Virginia smoked during their pregnancies. David Boucher, *Many Pregnant Women in WV Smoke, Health Data Shows*, Charleston Gazette-Mail, September 16, 2014, http://www.wvgazettemail.com/article/20140916/DM01/140919386/1420. Data collected by the U.S. Centers for Disease Control and Prevention showed that in 2011, 29% of pregnant women in West Virginia smoked during their pregnancies. *Id.* West Virginia had the highest rate of pregnant smokers in the nation between 2008 and 2011. *Id.*

3. Two years ago, the Tennessee Legislature enacted a "fetal assault" statute that permits the prosecution of a woman who gives birth to a child that is addicted to narcotics or harmed as a result of the woman's illegal narcotic use during pregnancy. Tenn. Code Ann. § 39-13-107 (2014). The statute excludes from punishment women who are "actively enrolled in an addiction recovery program" before delivery as long as they successfully complete the program after delivery. *Id.* The statute includes a sunset clause whereby it is set to expire on July 1, 2016. *Id.*

The penalty provided in the Tennessee law was intended to act as an incentive for drug-addicted pregnant women to either avoid illegal drug use or to enroll in a drug treatment program before delivery. Sheila Burke, *Doctors Applaud End of Tennessee's Fetal Assault Law*, Associated Press, April 1, 2016, *http://bigstory.ap.org/article/08ce8448799148bf852babadc33d1aef/doctors-applaud-end-tennessees-fetal-assault-law*. According to Tennessee doctors, however, fear of prosecution drove some pregnant women using illegal drugs

Regardless of any feelings we may have regarding what the law *should be*, the Legislature announces what the law *is*, and it has defined "child" in West Virginia Code § 61-8D-1 to exclude the unborn. Were this Court to itself legislate West Virginia Code § 61-8D-4a to include the unborn, which would brush aside succinctly stated statutory language, this Court would engage in the worst kind of result-oriented judicial activism.

As a judge following the rule of law, this must be my decision. But let me be clear: While the legislature has chosen not to criminalize the type of behavior in which Ms. Louk engaged, she factually *was* responsible for the death of her child. I pray that she recovers from her addiction.

Davis, Justice, concurring:

(Filed June 3, 2016)

An old adage counsels, "hard cases make bad law." Truer words could not be spoken of the case *sub judice*. Despite our different views as to the appropriate decision herein, all members of the Court agree that what has occurred in this case is nothing short of an unspeakable tragedy–a tragedy for the young victim who did not live to see her childhood and a tragedy for the child's mother who was gripped by the throes of addiction and is now, through her own actions, forever without her child. While the facts of this case are difficult, the law governing these proceedings is not. This is so because the Legislature clearly has defined those behaviors that are punishable as criminal acts and those that are not. Because the majority of the Court properly accepted the Legislature's plain and unambiguous language and correctly applied that law to reach its decision of this case, I concur in the majority's opinion.

Through this concurrence, I do not wish to rehash that which my brethren so astutely and eloquently have stated. In rendering the majority's decision, Chief Justice Ketchum

conducts a thorough statutory analysis, applying the plain meaning of the words employed by the Legislature in enacting W. Va. Code § 61-8D-4a (1997) (Repl. Vol. 2014) and reconciling that provision with other, similar statutes to ascertain the precise meaning of the word "child" intended by the Legislature. Moreover, to the extent that this case presented a tempting opportunity for this Court to adopt its own policy preferences over those expressly chosen by the Legislature, the majority has demonstrated admirable, and appropriate, restraint insofar as

[t]his Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal *Constitutions*.

Syl. pt. 2, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 679 S.E.2d 323 (2009).

I do, however, wish to take this opportunity to correct numerous inaccuracies and inconsistencies contained in the separate opinion of my dissenting colleagues for fear that their rhetoric may provide the basis for a misguided analysis should this issue be revisited by this Court or the Legislature. In an opinion that purports "to apply the law in accordance with our established principles of jurisprudence," this touted refrain becomes just that as the resulting diatribe, instead, contorts and confounds the law with a disjointed statutory analysis that confuses, rather than clarifies, the governing legal principles.

### Statutes Relating to the Same Subject Must Be Read In Pari Materia

We long have held that statutes pertaining to the same subject matter must be read in *pari materia*:

"to avoid prenatal care[,] ... exposing their babies to more risks while failing to reduce the astronomical costs of treating newborns who suffer from drug withdrawal." *Id.* Furthermore, since the fetal assault law was enacted, there has been no decrease in the number of afflicted chil-

dren born. *Id.* With no observable decrease in children born to drug-addicted mothers and with reports of pregnant women avoiding seeking health care for fear of criminal prosecution, Tennessee legislators voted not to extend the law passed its expiration date. *Id.*

Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly.

Syl. pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W. Va. 14, 217 S.E.2d 907 (1975). Stated otherwise, it is proper to look to corresponding statutes to provide guidance in interpreting and applying a controverted statute. *See* Syl. pt. 3, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975) ("Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments."). Here, the majority properly considered and compared the language of W. Va. Code § 61-8D-4a and W. Va. Code § 61-2-30 (2005) (Repl. Vol. 2014) in ascertaining the Legislature's intent in promulgating these provisions and determining that

> [t]he Legislature did not make any reference to an "unborn child" or "fetus" in W. Va. Code § 61-8D-4a [1997]. The statute only refers to a parent neglecting "a child" under his or her care, custody or control. Therefore, W. Va. Code § 61-8D-4a, our child neglect resulting in death statute, does not encompass prenatal acts that result in harm to a subsequently born child.

Maj. op. at Syl. pt. 2.

By contrast, the dissenters, while recognizing the existence of these two, distinct statutes, simply ignore the statutory construction canon of in *pari materia* and fail to reconcile the two provisions to achieve a harmonious, rather than discordant, interpretation. Instead, the construction proposed by the dissenting opinion will produce incongruous results: under the facts of the case *sub judice*, Ms. Louk could be prosecuted under W. Va. Code § 61-8D-4a but her same conduct would be exonerated by W. Va. Code § 61-2-30(d)(5). That W. Va. Code § 61-8D-4a pertains solely to neglect resulting in a child's death whereas W. Va. Code § 61-2-30 contemplates more heinous offenses is of no moment insofar as the victim's ultimate fate, under both statutes and the facts at issue herein, is her untimely death. In fact, this similarity between the two statutes is further evidence that the provisions should be construed consistently with one another or in *pari materia* insofar as the Legislature is presumed to know of its prior statutes and to intend statutory enactments to form one unified body of law.

A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it was intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.

Syl. pt. 5, *State v. Snyder*, 64 W. Va. 659, 63 S.E. 385 (1908). *See also Martin v. Randolph Cnty. Bd. of Educ.*, 195 W. Va. 297, 312, 465 S.E.2d 399, 414 (1995) (" '[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.' " (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)))[1] Nevertheless, the dissenters inexplicably ignore

---

1. It also should be noted that where two statutory provisions simply cannot be reconciled, the statute last enacted is controlling. *See State ex rel. Pinson v. Varney*, 142 W. Va. 105, 109, 96 S.E.2d 72, 74 (1956) ("If the several statutory provisions cannot be harmonized, controlling effect must be given to the last enactment of the Legislature."). Although the plain language of W. Va. Code § 61-8D-4a (1997) (Repl. Vol. 2014) answers the interpretative question presented by the case *sub judice*, if the Court had determined that W. Va. Code § 61-8D-4a and W. Va. Code § 61-2-30 (2005) (Repl. Vol. 2014) could not be reconciled, the latter statute, which exempts a mother from criminal liability for her actions that cause harm to her unborn child, would be controlling, which result is consistent with that obtained by the majority's opinion herein.

214

this canon of statutory construction, yielding more confusion than clarification of the applicable law.

### Avoidance of Unjust or Absurd Results

Similarly, the statutory construction canons direct reviewing courts to avoid unjust or absurd results.

> It is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity.

Syl. pt. 2, *Click v. Click*, 98 W. Va. 419, 127 S.E. 194 (1925). *Accord State ex rel. Pinson v. Varney*, 142 W. Va. 105, 109, 96 S.E.2d 72, 74 (1956) ("Where it is possible to do so, it is the duty of the courts, in the construction of statutes, to harmonize and reconcile laws, and to adopt that construction of a statutory provision which harmonizes and reconciles it with other statutory provisions." (internal quotations and citation omitted)). As my concurring colleague, Justice Benjamin, has duly noted, however, the dissenters also have refused to heed this "established principle[ ] of jurisprudence" by embarking upon their own quest to ascertain the meaning of the word "child" as that term is used in W. Va. Code § 61-8D-4a.

In the case *sub judice*, the majority, faced with a statute that did not definitively answer the question as to whether the statutory reference to "child" includes "unborn children," correctly compared the subject definition with the Legislature's definitions of the term in other, corresponding statutes. Upon concluding its inquiry, the majority then determined that, the term "child," as used in W. Va. Code § 61-8D-4a, pertains solely to children in being and does not include those yet to be born. By contrast, the dissent's strained interpretation of this term produces inconsistent and absurd results when it is logically extended to other statutory provisions employing the term "child." *See, e.g.*, W. Va. Code § 17C-15-46 (2005) (Repl. Vol. 2013) (requiring "[e]very driver who transports a *child* under the age of eight years in a passenger automobile ... shall ... provide for the protection of the *child* by properly placing, maintaining and securing the *child* in a *child* passenger safety device system ...." (emphasis added)); W. Va. Code § 49-7-101 (2015) (Repl. Vol. 2015) (adopting "Interstate Compact on the Placement of Children"; delineating procedure for child placements between states; and defining "child" as "a person who, by reason of minority is legally subject to parental, guardianship or similar control"). Again, the dissenters' failure to follow the established canons of statutory construction results in disparate results that certainly were not contemplated, or intended, by the Legislature in enacting the subject statute.

### Legislators, Not Justices, Make Public Policy Determinations

Furthermore, despite repeated admonitions to follow the law and to leave policy decisions to the Legislature, the dissenting opinion nevertheless ignores the plain statutory language and substitutes its own policy preferences for those of Legislature. It is well-established that a statute's plain language should not be construed but should be applied as it is written. *See* Syl. pt. 4, *West Virginia Health Care Cost Review Auth. v. Boone Mem'l Hosp.*, 196 W. Va. 326, 472 S.E.2d 411 (1996) ("If the language of an enactment is clear and within the constitutional authority of the law-making body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery."). Likewise, it is accepted that matters relating to the establishment or soundness of public policy are left to the wisdom of the Legislature and are not within the purview of this Court. *See* Syl. pt. 1, in part, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965) ("Courts are not concerned with questions relating to legislative policy."); Syl. pt. 1, *State Road Comm'n of West Virginia v. County Court of Kanawha Cnty.*, 112 W. Va. 98, 163 S.E. 815 (1932) ("Courts are not concerned with questions relating to the policy of a legislative enactment. These questions are solely for the legislature."); Syl. pt. 3, *George v. Board of*

*Ballot Comm'rs*, 79 W. Va. 213, 90 S.E. 550 (1916) ("The policy of a statute is legislative, not judicial, and it is the exclusive province of the legislature to declare the scope and extent thereof by its prescription of measures of enforcement and otherwise.").

Despite its protestations to the contrary, it is clear that the result proposed by the dissenters' opinion is based solely upon their preferred policy pronouncements as their failure to abide by established canons of statutory construction cannot otherwise be explained. Although they proclaim that, "[r]egardless of any feelings we may have regarding what the law *should be*, the Legislature announces what the law *is*," my dissenting brethren nevertheless profess that the statute under scrutiny, W. Va. Code § 61-8D-4a, should apply to criminalize Ms. Louk's actions. This suggested interpretation is directly contrary to the statute's plain language; cannot be reconciled with the Legislature's other, corresponding statutes; and does not comport with the Legislature's unmistakable intent in enacting such legislation. Again, the dissenters preach one set of rules, but practice another.

### Inappropriate Reliance on Inapposite Authority

Aside from the failure to acknowledge and apply the prevailing canons of statutory construction, I would be remiss if I did not also note that the cases relied upon by my dissenting brethren as suggesting that other courts would apply the born alive rule to hold a mother criminally liable for her child's *in utero* injuries caused by the mother's actions do *not* have the same fact pattern as the case *sub judice*. That is, *all* of the extra-jurisdictional authority cited for this proposition involves harm to the unborn child that was inflicted by a person *other than the child's mother*. See *Ranger v. Georgia*, 249 Ga. 315, 290 S.E.2d 63 (Ct. App. 1982) (unborn child born prematurely after pregnant mother's boyfriend shot her in the head; child died shortly after birth); *Illinois v. Bolar*, 109 Ill. App. 3d 384, 64 Ill. Dec. 919, 440 N.E.2d 639 (1982) (unborn child injured when intoxicated driver hit car in which pregnant mother and unborn child were passengers; child died shortly after birth); *Jones v. Kentucky*, 830 S.W.2d 877 (Ky. 1992) (unborn child injured when intoxicated driver hit car in which pregnant mother and unborn child were passengers; child died shortly after birth); *Williams v. Maryland*, 316 Md. 677, 561 A.2d 216 (1989) (unborn child injured when pregnant mother was fatally shot by arrow as pedestrian bystander caught in crossfire between defendant and another man; child died shortly after birth); *New Jersey v. Anderson*, 135 N.J. Super. 423, 343 A.2d 505 (1975) (unborn twins born prematurely after pregnant mother was fatally shot; both children died shortly after birth); *New York v. Hall*, 557 N.Y.S.2d 879, 158 A.D.2d 69 (1990) (unborn child injured when pregnant mother was shot in the abdomen as a passerby caught in crossfire between defendant and another man; child died shortly after birth); *Cuellar v. Texas*, 957 S.W.2d 134 (Tex.Ct. App.1997) (unborn child injured when intoxicated driver hit car in which pregnant mother and unborn child were passengers; child died shortly after birth). While the majority opinion also relied on cases from our sister jurisdictions to support its ultimate decision, those cases, unlike the ones cited by the dissenters, are based upon rulings rendered under fact patterns similar to the one presently before the Court and that are instructive to the Court's analysis. Thus, rather than providing solid authority to support its position, the foundation upon which the dissenting opinion seeks to base its inapposite view necessarily crumbles.

In their attempt to suggest shortcomings with the majority's analysis, the dissenters, instead, eschew well-established principles of statutory construction in favor of a hodge podge approach that selects those canons supportive of their position while ignoring the rest. Because the majority's opinion herein is well-reasoned, legally sound, and reaches the correct result under the governing statutes, I concur in the majority's decision in this case.

LOUGHRY, J., dissenting:

Olivia Ann Vangeline Louk was eleven days old when she died as a result of her mother's neglect. West Virginia Code § 61-8D-4a provides that the mother's conduct

constitutes a felony punishable by a three-to-fifteen-year term of imprisonment. Yet, the majority, undoubtedly persuaded by the amici, has decided that no crime was committed because the neglect occurred before Olivia was born. While it is certainly not unusual for this Court to be presented with intensely emotional issues, this case in particular amplifies the Court's challenge to render justice in the face of facts that touch upon deeply personal and diversely-held beliefs. Our role in this case was the same as it is in all others: to apply the law in accordance with our established principles of jurisprudence. The majority's result-oriented analysis proves, however, that it allowed policy implications and social ramifications to play a role in its decision. The rule of law commanded one outcome in this case—affirming the petitioner's conviction. Because the majority has utterly disregarded the plain language of West Virginia Code § 61-8D-4a and vacated the petitioner's conviction, I dissent.

It is undisputed that Olivia was born alive on June 12, 2013, and subsequently died as a result of her mother's injection of methamphetamine into her bloodstream just hours before Olivia was born. While Olivia was delivered by emergency Cesarean section, the treating physician testified that the pregnancy was "full term." [1] There is no evidence that Olivia had a congenital defect that would have otherwise prohibited her from living a normal, healthy life. Olivia only lived eleven days because the methamphetamine injection caused her mother to suffer respiratory distress that inevitably deprived Olivia of oxygen for a significant period of time resulting in irreversible brain damage. There is no question that Olivia's death was caused by her mother's decision to neglect her child's welfare, a fact that her mother readily acknowledged. When asked if she considered Olivia's welfare when she took the illegal drug, the petitioner confessed, "I didn't and I should have." She attributed her behavior to "stupidity."

West Virginia Code § 61-8D-4a provides that "if any parent . . . shall neglect a child

under his or her care, custody or control and by such neglect cause the death of said child, then such parent . . . shall be guilty of a felony." West Virginia Code § 61-8D-1(2) defines "child" as "any person under eighteen years of age not otherwise emancipated by law." This Court has long held that "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959). There is no ambiguity concerning the application of the relevant statutory provisions to the facts of this case. At the age of eleven days, Olivia was a child within the meaning of W.Va. Code § 61-8D-1(2), and she died as a result of neglect by her mother.

Rather than apply the law as written by the Legislature, the majority chose to focus on the fact that the neglect that caused Olivia's death occurred before she was born. Under the plain language of the statute, this fact is immaterial. West Virginia Code § 61-8D-4a contains no requirement that the neglect that causes death be inflicted on the child after birth. Moreover, our common law provides that if a "child is born alive, and dies by reason of injuries received in the womb, or in the act of birth, the person who deliberately inflicted those injuries may be guilty of murder." *State ex rel. Atkinson v. Wilson*, 175 W.Va. 352, 353, n.3, 332 S.E.2d 807, 808, n.3 (1984) (quoting 4 S. Stephen, Commentaries on the Laws of England 58 (1914)). Referred to as the "born alive" rule, this common law has been a part of our jurisprudence since West Virginia first became a State in 1863. In *Atkinson*, this Court was confronted with the opportunity to extend the "born alive" rule to the death of an unborn child. Recognizing that only the Legislature has the authority to change the common law, this Court refused to alter the "born alive" rule to create criminal liability for the murder of a viable unborn child. *Id.* at 356, 332 S.E.2d at 812.

---

**1.** The petitioner's medical records indicate she was scheduled to undergo a Cesarean section on June 26, 2013.

West Virginia Code § 2-1-1 provides that the common law of England "shall continue in force" unless altered by the West Virginia Legislature. Accordingly, this Court has held that " ' " [t]he common law is not to be construed as altered or changed by statute, unless legislative intent to do so be plainly manifested." *Shifflette v. Lilly*, 130 W.Va. 297, 43 S.E.2d 289 [1947].' Syllabus Point 4, *Seagraves v. Legg*, 147 W.Va. 331, 127 S.E.2d 605 (1962)." Syl. Pt. 4, *State ex rel. Van Nguyen v. Berger*, 199 W.Va. 71, 483 S.E.2d 71 (1996). There is no evidence that the Legislature intended to alter the application of the common law "born alive" rule through its statutory definition of "child" in West Virginia Code § 61-8D-1(2).

In construing a statute, we "presume[ ] that the legislators who drafted and passed it were familiar with all existing law applicable to the subject-matter, whether constitutional, statutory, or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syl. Pt. 5, in part, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908). Moreover, "[o]ne of the axioms of statutory construction is that a statute will be read in context with the common law unless it clearly appears from the statute that the purpose of the statute was to change the common law." Syl. Pt. 2, *Smith v. West Virginia State Bd. of Educ.*, 170 W.Va. 593, 295 S.E.2d 680 (1982). Given that there is no indication in either West Virginia Code § 61-8D-4a or West Virginia Code § 61-8D-1(2) of legislative intent to abrogate the common law "born alive" rule, there is no basis to conclude that the petitioner cannot be held criminally liable for Olivia's death.

Other "American courts . . . have in the absence of specific inclusive statutory language unanimously refused to abandon th[e] born alive rule in criminal cases." *People v. Bolar*, 109 Ill.App.3d 384, 64 Ill.Dec. 919, 440 N.E.2d 639, 644 (1982). Indeed, based on the "born alive" rule, other jurisdictions have expressly held "it is not necessary that all of the elements of a criminal offense be immediately satisfied at the time of the defendant's conduct." *Cuellar v. State*, 957 S.W.2d 134,

139 (Tex.Ct.App.1997). *See also Ranger v. State*, 249 Ga. 315, 290 S.E.2d 63, 66 (1982) (affirming felony murder conviction based on evidence infant victim survived twelve hours before dying as result of premature delivery caused by shooting of mother); *Jones v. Commonwealth*, 830 S.W.2d 877, 879 (Ky.1992) (upholding manslaughter conviction because "the victim was a fetus when the criminal act occurred, but a person when death occurred so the criminal act resulted in the death of person"); *Williams v. Maryland*, 316 Md. 677, 561 A.2d 216, 219 (1989) (concluding "criminal infliction upon a pregnant woman of prenatal injuries resulting in the death of her child after live birth may constitute manslaughter" pursuant to common law "born alive" rule); *New Jersey v. Anderson*, 135 N.J.Super. 423, 343 A.2d 505, 509 (Ct. Law Div.1975) (stating "fetuses which are the victims of a criminal blow or wound upon their mother and are subsequently born alive, and thereafter die by reason of a chain of circumstances precipitated by such blow or wound, may be victims of murder"); *People v. Hall*, 158 A.D.2d 69, 557 N.Y.S.2d 879, 883 (1990) (finding evidence established infant victim was born alive and thus was "person" within meaning of homicide statutes).

The majority's reliance upon West Virginia Code § 61-2-30, known as the Unborn Victims of Violence Act ("Act"), to support its conclusion that the "born alive" rule has been abrogated is misplaced. The Act governs prosecution of persons who injure or cause the death of unborn children by committing certain violent crimes set forth in Chapter 61, Article 2 of the West Virginia Code. As such, the Act serves to expand the common law "born alive" rule to include unborn children. The exemption for acts or omissions of pregnant women set forth in the Act only applies to those crimes of violence set forth in Chapter 61, Article 2 of the West Virginia Code. The exemption does not apply to the crime committed by the petitioner—child neglect causing death.

Holding the petitioner criminally liable for causing Olivia's death does not offend due process notions of fundamental fairness or render West Virginia Code § 61-8D-4a impermissibly vague. The majority's conclusion

that the petitioner could not have reasonably known that she could be prosecuted for her prenatal conduct is absurd. The petitioner engaged in criminal activity—the use of illegal drugs—and caused the death of her child. It is common knowledge that use of illegal substances by pregnant mothers subjects their unborn children to a high risk of injury. The petitioner readily admitted she knew injecting methamphetamine into her vein would put Olivia at risk. She simply chose to completely disregard Olivia's welfare. She should be held accountable for her actions.

While the majority and amici insist that affirming the petitioner's conviction would result in future prosecutions of pregnant mothers who engage in lawful, low-risk activities that are contraindicated during pregnancy and cause harm to their children, there is no basis for that conclusion. In that regard, West Virginia Code § 61-8D-1(7) defines "neglect" as "the *unreasonable* failure by a parent, guardian or custodian of a minor child to exercise a *minimum* degree of care to assure the minor child's physical safety or health." (emphasis added). This Court has observed that this definition is sufficient to "give[ ] a person of ordinary intelligence fair notice that his or her contemplated conduct is *prohibited* and it also provides adequate standards for adjudication." Syl. Pt. 3, in part, *State v. DeBerry*, 185 W.Va. 512, 408 S.E.2d 91 (1991) (emphasis added). The laundry list of legal activities that the majority and amici claim may be subject to prosecution if the petitioner's conviction were af-

firmed simply does not correspond to the certainty of injury that results from exposure to a controlled substance such as methamphetamine. More importantly, it is this Court's duty to apply the law as written and not to consider whether our decision will yield prosecutions which militate against the various public policy concerns expressed by the amici. As the petitioner herself ardently insists, such determinations are reserved to the Legislature.

Judicial challenge " 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' " *MacDonald v. City Hosp., Inc.*, 227 W.Va. 707, 722, 715 S.E.2d 405, 420 (2011) (quoting *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Therefore, it is not for this Court to speak to whether it should or should not be a crime for a mother to engage in criminal activity which injures a child in utero that is later born alive and subsequently dies—the law reveals that it is—and thus ends this Court's charge.

Accordingly, I respectfully dissent. I am authorized to state that Justice Workman joins in this dissent.